UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                                          Chapter 7

DOUGLAS FILARDO                                       Case No: 23-71732-reg
a/k/a DOUGLAS J. FILARDO
a/k/a DOUGLAS JOHN FILARDO,

                               Debtor.
--------------------------------------------------------X
STAR AUTO SALES OF QUEENS, LLC                 Adv Pro No.: 23-08054-reg
d/b/a STAR SUBARU,

                            Plaintiff,

     against

DOUGLAS FILARDO,

                            Defendant.
--------------------------------------------------------X

## DECISION AFTER TRIAL

       This matter is before the Court pursuant to an adversary proceeding commenced by Star

Auto Sales of Queens, LLC d/b/a Star Subaru (the "Plaintiff") against Douglas Filardo (the

"Debtor" or the "Defendant") seeking to have a debt in an amount that has yet to be fixed

deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6).

Prepetition, the Debtor was found liable in a state court action for fraud and conversion while

working as an employee of the Plaintiff, a Subaru dealership. The Debtor misappropriated cash

deposits from customers purchasing vehicles from the Plaintiff and collected advertising fees

from the Plaintiff for work which his sole proprietorship did not perform. Based on findings by

the state court after the Debtor's answer was stricken, judgment by default was entered against

the Debtor on multiple counts. Just before trial, the Plaintiff filed a motion *in limine* seeking to

preclude the Debtor from challenging the allegations in the state court complaint, based on the

entry of judgment by default in the state court proceeding.  At trial in this adversary proceeding, the Debtor was given an opportunity to testify and provide evidence to support his defense of lack of intent, which is an element in each of the non-dischargeability causes of action set forth in the complaint. When called to testify, the Debtor asserted his Fifth Amendment privilege against self-incrimination to each question posed by the Plaintiff's counsel. While the Debtor has the right to assert this privilege, the Court can draw an adverse inference from the assertion of this right.

The Court has reviewed the record, which includes the allegations in the state court complaint which are deemed admitted, the trial testimony of the Plaintiff's principal and the exhibits introduced by the Plaintiff.  This record, together with the adverse inference drawn from the Debtor's assertion of his Fifth Amendment privilege when questioned regarding his intent at the time he kept the customer deposits and charged the Plaintiff for advertising services which were not performed, is sufficient to find by a preponderance of the evidence in favor of the Plaintiff on each cause of action. Therefore, the debt owed to the Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6).

## PROCEDURAL HISTORY

The Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code on May 16, 2023.  On August 16, 2023, the Plaintiff filed this adversary proceeding [ECF 1].  On September 15, 2023, the Debtor filed an answer [ECF 4].  On September 20, 2023, the Plaintiff filed an amended complaint [ECF 5].  On September 27, 2023, the Debtor filed an answer to the amended complaint [ECF 6]. On January 8, 2024, the Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R Bankr. P. 7012(c) ("Rule 12(c) Motion") [ECF 9]. On March 20, 2024, the Debtor filed opposition to the Rule 12(c) Motion [ECF 14]. On April 4, 2024, the

Plaintiff filed a reply memorandum in further support of the Rule 12 (c) Motion [ECF 16].  On May 9, 2024, an order was entered denying the Rule 12(c) Motion [ECF 18]. On May 13, 2024, the Plaintiff filed a notice of appeal from the order denying the Rule 12(c) Motion [ECF 19]. Pursuant to the pretrial order entered on March 7, 2025, a trial was scheduled to commence on May 15, 2025.

On March 14, 2025, the Plaintiff filed an application for an expedited hearing on the Plaintiff's motion to stay this adversary proceeding pending the outcome of the appeal, which was denied on March 17, 2025 [ECF 38, 41]. On March 31, 2025, the Plaintiff filed a motion for entry of an order (i) to preclude the Defendant from contesting at trial any allegations deemed admitted by the New York State Supreme Court, Queens County ("State Court"), (ii) to preclude the Debtor from offering any evidence at trial concerning subject matter for which the Debtor previously invoked his Fifth Amendment right against self-incrimination; and (iii) for an adverse inference by virtue of the Debtor's assertion of his Fifth Amendment right in a prior proceeding [ECF 43]. On April 1, 2025, the Defendant filed a motion *in limine* ("Defendant's Motion *in Limine*") to exclude certain witnesses and testimony at the scheduled trial, and in opposition to the Plaintiff's First Motion *in Limine* [ECF 44]. On April 7, 2025, the Plaintiff filed opposition to the Defendant's Motion *in Limine* [ECF 46]. On April 8, 2025, the Defendant filed a pretrial statement [ECF 47] and the Plaintiff filed a second motion (Plaintiff's Second Motion *in Limine*) to preclude the Debtor from introducing undisclosed documentary evidence and from asserting the unpleaded affirmative defense of payment [ECF 48]. On April 9, 2024, the parties filed a joint pretrial memorandum [ECF 49]. On April 13, 2025, the Debtor filed a reply to the Plaintiff's First Motion *in Limine* and opposition to the Plaintiff's Second Motion *in Limine* [ECF 42]. On April 15, 2025 the trial was held and the Plaintiff's First Motion *in Limine* was

granted in part. At the trial, the Plaintiff called Michael Koufakis and the Debtor as witnesses. The Debtor asserted his Fifth Amendment privilege against self-incrimination as to every question. The Debtor did not introduce any evidence at trial regarding repayment to the Plaintiff. Therefore, the Plaintiff's Second Motion *in Limine* is moot. Upon conclusion of the trial, the matter was marked submitted.

## FACTS

From 2006 through November 2017, the Debtor was employed by the Plaintiff as a sales manager for the auto dealership.  While employed by the Plaintiff, the Debtor was responsible for overseeing all matters related to the Plaintiff's new and used vehicle sales, which included ordering vehicles, selling vehicles, advertising, hiring of salespersons and managing the sales force on a daily basis. From time to time, auto customers would purchase vehicles from the Plaintiff using cash deposits.  A few times per month, the Debtor kept cash deposits he received from the Plaintiff's customers instead of turning them over to the Plaintiff. The Debtor would advise the Plaintiff's office employees that he never received the cash deposits from certain customers, but that funds provided by Subaru of America Inc. ("Subaru of America") would cover the shortfall. The money used to cover the shortfalls came from annual advance payments made by the Plaintiff to Subaru of America, which issued such payments in the approximate amount of $130,000 per year to the Plaintiff as part of a national program for all Subaru dealerships from March 2013 through 2016. The Debtor enlisted the help of Vivian Karouzakis, a former office manager of the Plaintiff, to account for the advances under "Services and Parts Receivables." At some point during each year, Karouzakis used the advance payment from Subaru of America to "fill in" the debt created by the cash deposits taken by the Debtor during the previous year.  Vivan Karouzakis was fired by the Plaintiff in December 2016. Her sister Despina Theocharis became the office manager for the Plaintiff and took over Karouzakis's role

in the scheme until her termination in April 2017.  After Theocharis was terminated, the Debtor continued with the scheme until July 2017.

The Debtor also used the company, Motorsports of America, which the Debtor created in 2008 as a sole proprietorship, to extract additional funds from the Plaintiff. The Debtor then hired New Vision Advertising to provide nominal advertising services for the Plaintiff. The Debtor used Motorsports Advertising as an intermediary between the Plaintiff and New Vision Advertising. The Debtor created fake invoices on behalf of Motorsports Advertising at marked up prices over and above the prices New Vision Advertising had billed the Plaintiff. The Debtor hand delivered the invoices to the Plaintiff, and the Plaintiff issued payment to Motorsports Advertising. The Debtor would deposit the checks into a Motorsports Advertising account and pay New Vision Advertising significantly less than the amount of the invoices issued by Motorsports Advertising. The Debtor would keep the difference between each New Vision Advertising invoice and the Motorsports Advertising invoice. To conceal the scheme from New Vision Advertising, the Debtor advised New Vision Advertising that the Plaintiff owned Motorsports Advertising. The Debtor also told New Vision Advertising not to speak with Michael Koufakis or they would lose the Plaintiff's business.[1]

After uncovering the fraudulent conduct, the Plaintiff commenced an action against the Debtor in State Court on December 15, 2017. The amended complaint ("Amended State Court Complaint") asserts claims against the Debtor for (1) aiding and abetting fraud; (2) civil conspiracy; (3) fraud and deceit; (4) unjust enrichment; (5) money had and received; (6) fraud by nondisclosure; (7) promissory estoppel; (8) breach of fiduciary duty; (9) breach of duty of loyalty; (10) violation of the faithless servant doctrine; (11) conversion; and (12) fraudulent

---

[1] The facts set forth in the first two paragraphs were taken from the Amended Complaint, Ex. B to the Plaintiff's First Motion *in Limine* [ECF 43].

concealment by a fiduciary. Plaintiff's First Motion *in Limine*, Ex. A. On March 15, 2021 the

State Court entered an order ("Order Striking Answer") striking the Debtor's answer as a

sanction for his failure to appear for his deposition. Plaintiff's First Motion *in Limine*, Ex. B. By

having the Debtor's answer stricken, all allegations in the Amended State Court Complaint were

deemed admitted in the state court action. An inquest was scheduled by the state court for

September 27, 2021.  Due to the filing of a petition for relief by the Debtor under chapter 13 on

September 27, 2021, the inquest was stayed. (Case no. 21-71691). The chapter 13 case was

dismissed by the Court on January 6, 2022. On January 13, 2022, the inquest was rescheduled for

March 15, 2022 and then for various reasons was rescheduled for May 1, 2023. On April 26,

2023, the Debtor filed an order to show cause in state court seeking to stay the scheduled inquest,

which was granted in part. Rule 12(c) Motion, Ex. I. On May 16, 2023, the Debtor filed the

instant petition for relief under chapter 7, which has stayed the inquest.

In this adversary proceeding, the Plaintiff filed the Rule 12(c) Motion seeking entry of

judgment in favor of the Plaintiff on each cause of action. The Plaintiff relied upon the Order

Striking Answer as a basis for the Rule 12(c) Motion.  For several reasons, including the

procedural posture of the state court case when the Order Striking Answer was entered, the Rule

12(c) Motion was denied.[2]

At trial, the Plaintiff introduced the testimony of Michael Koufakis, the owner of the

Plaintiff.  Michael Koufakis testified that the Debtor worked for the Plaintiff as a general sales

manager and was responsible for the sales of new and used vehicles. Trial Tr. p. 44. According to

Mr. Koufakis, he uncovered a scheme spearheaded by employees of the Plaintiff where they

---

[2] At the time the Order Striking Answer was entered, all the claims sounding in fraud had been dismissed pursuant to an order of the state court dated March 29, 2019.  Debtor's opposition to Rule 12(c) Motion, Ex. F. The claims sounding in fraud were reinstated on appeal on March 9, 2022 after the Order Striking Answer was entered.

presented Mr. Koufakis's elderly father, John Koufakis, with intercompany checks to sign and they cashed the checks and took the proceeds for their own benefit. Trial Tr. p. 49-50. As a result of the theft, in early 2017, Mr. Koufakis began examining the financial transactions for the Plaintiff more closely and noticed that the Debtor sold a vehicle to a broker for no profit and the Debtor purchased toner at a steep price from an unknown company in California when he could have obtained it locally at a better price. Trial Tr. p. 48-49. The Debtor was warned sometime in 2017 to refrain from selling vehicles for no profit and to stop buying office supplies because this was not part of his job. Trial Tr. p. 49. In November 2017, the Debtor abruptly quit when he was questioned why he did not keep and maintain advertising paperwork for the Plaintiff. Trial Tr. p. 47.

After the Debtor quit, Mr. Koufakis ascertained the extent of the Debtor's misconduct. Mr. Koufakis testified that the Debtor utilized bogus "Customer Claim Forms" for the purpose of granting phony rebates to customers. Trial Tr. p. 58. In December 2017, Mr. Koufakis first discovered the existence of the Subaru of America incentive program to encourage the sales of service contracts and how the Debtor used it to conceal his theft. Under this program, if the Plaintiff sold one thousand cars, Subaru of America would forward to the Plaintiff approximately $120,000 based on an estimate that 60% of the car purchasers would opt for service contracts. The advance of $200 per service contract would then be adjusted at the end of the year based on the actual number of service contracts sold. Trial Tr. p. 63. The Debtor would account for the funds forwarded by Subaru of America as service and parts receivables using the customer claim forms; however, the new cars would have had virtually no need for parts and servicing within one year of purchase. The bogus Subaru customer claim forms were used to document the alleged expenses for the servicing and parts, but the funds were used to conceal the theft of

customer deposits. Trial Tr. p. 63-65. As the sales manager for the Plaintiff, the Debtor was solely responsible for collecting the deposits and turning them over to the accounting office. Trial Tr. p. 68. The Debtor was also the sole employee responsible for selling each vehicle, which required payment in full before being released. Trial Tr. p. 75-76. The Plaintiff would never deliver damaged new cars to customers and it would be the financial responsibility of the car carrier or the Plaintiff to repair a damaged vehicle prior to sale. Trial Tr. p. 78, 79.

With respect to Motorsports Advertising, the Debtor did not tell Mr. Koufakis that he was affiliated with Motorsports Advertising. This was something Mr. Koufakis discovered in January 2018.  Trial Tr. p. 80.  In sum, the Plaintiff paid Motorsports Advertising approximately $1.4 million from 2011 to 2017.  Pl. Ex. 14. The bulk of the checks from the Plaintiff to Motorsports Advertising were signed by Mr. Koufakis's father. Trial Tr. p. 86; Pl. Ex. 14. Once Mr. Koufakis became alerted to some irregularities with Motorsports Advertising, he searched for invoices from Motorsports Advertising in the Plaintiff's files, but it appeared that the file for the Motorsports Advertising invoices was missing and he only located a few miscellaneous invoices. Trial Tr. p. 92-93. In fact, Motorsports Advertising provided very little advertising for the Plaintiff. Trial Tr. p. 94.  According to the scheme, Motorsports Advertising purported to retain New Visions to provide advertising for the Plaintiff and the Plaintiff would pay Motorsports Advertising.  Motorsports Advertising would then pay New Vision for the work performed. Motorsports Advertising was little more than another scam to siphon money from Plaintiff to the Debtor.

The only other witness to testify for the Plaintiff was the Debtor.  He was asked a series of questions by counsel to the Plaintiff and he asserted his Fifth Amendment privilege against self-incrimination in response to every question. The questions included whether he stole

customer cash deposits while employed by the Plaintiff, whether he did so knowingly and willingly, and whether he had the Plaintiff pay Motorsports Advertising for services that were never performed and kept the payments for his own benefit. Trial Tr. p. 127. The Debtor was also directly questioned whether he intended to defraud the Plaintiff by taking customer cash deposits and advertising funds for his own benefit. Trial Tr. p. 128.

At the close of testimony, the Court heard oral argument with respect to the Plaintiff's First Motion *in Limine* and granted it. As a result, the allegations in the State Court Amended Complaint were not subject to challenge in the instant adversary proceeding. The Court opined that based on this ruling, the Debtor could not contest that he took funds belonging to the Plaintiff when he kept customer deposits and through invoicing the Plaintiff for work allegedly performed by Motorsports Advertising. The Debtor's testimony at trial regarding his intent surrounding these events would be critical as a defense to the allegations contained in the complaint. Because the Debtor asserted his Fifth Amendment privilege against self-incrimination the Court was inclined to draw an adverse inference against the Debtor. On April 22, 2025, the Court entered the order granting the First Motion *in Limine* in part, precluding the Debtor from contesting at trial all allegations contained in the State Court Amended Complaint. (ECF No. 53).

## DISCUSSION

1. <u>Plaintiff's First Motion *in Limine*</u>

Plaintiff's First Motion *in Limine* seeks to preclude the Debtor from introducing certain evidence at trial and seeks an adverse inference finding in connection with the Debtor's prior assertion of his Fifth Amendment privilege against self-incrimination in a state court proceeding. Because the Debtor has asserted his Fifth Amendment privilege during the trial in this

proceeding, the Court only ruled on the request to preclude evidence. "The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quotations omitted). The Plaintiff's purpose in making the motion is to avoid wasting time and to prevent undue delay. Fed. R. Evidence 611 also imposes upon the trial court the responsibility of ascertaining the truth balanced against the need of the court to conserve judicial resources. 4 MARK S. BRODIN ET AL., WEINSTEIN'S FEDERAL EVIDENCE § 611.02[2][b][ii]. Rule 611 confers upon the Court "wide latitude" in controlling the presentation of evidence. *SR Intern. Business Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006).

In the State Court Action, the Debtor's answer was stricken and as a result, the allegations in the State Court Amended Complaint are deemed admitted. These allegations are included in the facts above and are not subject to challenge. The Debtor had a full and fair opportunity to contest the allegations in the State Court Amended Complaint and therefore the Court may accept them for the purposes of making findings in this adversary proceeding.

    2.  <u>Assertion of Fifth Amendment Privilege</u>

The Debtor was called as a witness by the Plaintiff and he asserted his Fifth Amendment privilege to each question asked of him. This was his opportunity to explain his conduct and give the Court some basis to find that the debt owed to the Plaintiff is dischargeable in whole or in part. The Fifth Amendment protects an individual from answering official questions asked in civil and criminal proceedings "where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). However, assertion of the Fifth

Amendment privilege against self-incrimination is not without consequence. The Supreme Court

has recognized that in civil cases such as this proceeding, the Court may draw an adverse

inference against a party who refuses to testify in response to probative evidence introduced

against the party. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). "[I]f a witness refuses to

answer a question by invoking the Fifth Amendment, the Court can draw an inference that the

answer *to that question* would be adverse to the claimant." *In re Bernard L Madoff Inv. Sec. LLC*,

560 B.R. 208, 227 (Bankr. S.D.N.Y. 2016) (emphasis in original). Therefore, in addition to

having the allegations in the State Court Amended Complaint deemed admitted, the Court can

draw an adverse inference as to each of the questions asked of the Debtor at trial. Based on the

specific questions asked of the Debtor, the Court finds that he knowingly intended to defraud the

Plaintiff when he took the Plaintiff's customer deposits and advertising payments in excess of

what was paid by Motorsports Advertising to New Vision Advertising. Having made these

findings, the Court shall analyze each cause of action while keeping in mind that the Plaintiff has

the burden of establishing an exception to discharge of a debt under § 523 by a preponderance of

the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90 (1991).

3.  First Cause of Action Pursuant to 11 U.S.C. § 523(a)(2)

The Plaintiff seeks to except from discharge the amount of customer deposits the Debtor

withheld and the funds the Debtor deposited into the Motorsports Advertising bank account

pursuant to Bankruptcy Code section 523(a)(2)(A). This subsection excepts from discharge "any

debt … for money … to the extent obtained by false pretenses, a false representation, or actual

fraud." For a debt to be non-dischargeable due to actual fraud, a creditor must only establish

"anything that counts as 'fraud' and is done with wrongful intent." *Husky Intern. Electronics,*

*Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Under Second Circuit authority, actual fraud requires "a

false representation, scienter, reliance and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir.

2006).

Based on the record before the Court, each element of section 523(a)(2)(A) has been

established by a preponderance of the evidence. The order granting the Plaintiff's First Motion *in*

*Limine,* coupled with the testimony of Mr. Koufakis, establishes that the Debtor took cash

deposits belonging to the Plaintiff for his own benefit and concealed the theft by applying funds

from the Subaru of America incentive program to make up the difference over multiple years.

The Plaintiff relied on the Debtor to collect the cash deposits from customers and was unaware

that the Debtor was using funds from the incentive program to hide the theft. The Debtor also

created Motorsports Advertising as a sole proprietorship and gave the Plaintiff the impression

that this entity would provide advertising services to the Plaintiff. However, the Debtor hired

New Vision Advertising to create fake mailing samples and used the invoices New Vision

Advertising issued as templates for fake invoices the Debtor created and provided to the Plaintiff

on behalf of Motorsports Advertising. According to Mr. Koufakis's testimony, the Debtor would

usually seek out Mr. Koufakis's elderly father to issue the checks to Motorsports Advertising,

most likely because he would not question the expenses. The Plaintiff's reliance on the false

invoices was reasonable based on the invoices provided by the Debtor. Upon receipt of these

invoices, the Plaintiff paid Motorsports Advertising for services which were never provided to

the Plaintiff. When the Debtor was questioned regarding his intent in taking these funds, he

asserted his Fifth Amendment privilege against self-incrimination. The elements of false

representations, the Debtor's scienter, reliance by the Plaintiff on the representations and harm

are all established by a preponderance of the evidence in this case. Therefore, the debt incurred

in connection with the first cause of action is non-dischargeable under the fraud exception pursuant to section 523(a)(2)(A).

### 4. Second Cause of Action Pursuant to 11 U.S.C. § 523(a)(4)

A debt is non-dischargeable under this section if it is one "for fraud or defalcation while acting in a fiduciary capacity embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To establish fraud or defalcation while acting in a fiduciary capacity, there must be a fiduciary relationship at the time the debt was created. *Palisades Tickets, Inc. v. Daffner (In re Daffner)*, 612 B.R. 630, 651 (Bankr. E.D.N.Y. 2020). Because the Debtor was an employee only of the Plaintiff, he was not a fiduciary of the Plaintiff. *See Grow Up Japan, Inc. v. Yoshida (In re Yoshida)*, 435 B.R. 102, 110 (Bankr. E.D.N.Y. 2010) (Mere employer/employee relationship insufficient to establish fiduciary relationship under § 523(a)(4)).

A debt may still be non-dischargeable under this section if it is obtained by larceny or embezzlement. "To successfully plead that a claim is non-dischargeable under section 523(a)(4) due to embezzlement, a creditor must prove: (1) that the creditor entrusted his property to the debtor; (2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit." *In re Sesum*, 662 B.R. 840, 847 (Bankr. S.D.N.Y. 2024) (citing *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985)). Each element is satisfied in this case. The Debtor was entrusted with the customers' cash deposits which were to be turned over to the Plaintiff. Instead, the Debtor kept the deposits for his own use with intent to defraud the Plaintiff. The same is true with respect to the checks paid to Motorsports Advertising. The Debtor induced the Plaintiff to make the payments for advertising that was largely not provided and the Debtor kept the lion's share of the funds for his own personal use. He did so with the intent to defraud the Plaintiff over

several years. Accordingly, the sums paid to Motorsports Advertising and the cash deposits embezzled by the Debtor are non-dischargeable debts.

5.   Third Cause of Action Pursuant to 11 U.S.C. § 523(a)(6)

A debt is non-dischargeable under § 523(a)(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6). The injury must be both willful and malicious. "Willfulness is defined as headstrong and knowing conduct, and malicious is defined as conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm." *In re Hopkins*, 469 B.R. 319, 324 (Bankr. W.D.Mo. 2012).  The record reflects that as an employee, the Debtor had a clear obligation to turn over the cash customer deposits to the Plaintiff, and this failure to do so was knowing, willful and malicious. The Debtor intended to defraud the Plaintiff and used funds from the Subaru incentive plan to conceal his misappropriation. With respect to the advertising fees, the Debtor carefully devised a scheme to mislead the Plaintiff into believing it was dealing with a third party to provide legitimate advertising services. In fact, the third party was a proprietorship set up by the Debtor to siphon significant funds from the Plaintiff without providing any real services.  The Debtor consciously chose Mr. Koufakis's elderly father to review the invoices and cut the checks and prohibited New Vision Advertising from contacting the Plaintiff to ensure that the scheme would continue undetected. The Debtor's intentional conduct is what sets it apart from a simple case of negligence. Therefore, both debts are non-dischargeable pursuant to Bankruptcy Code § 523(a)(6).

## CONCLUSION

For the reasons set forth in this Decision After Trial, the debt owed to the Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6). Judgment shall be entered in favor of the Plaintiff as to each cause of action in the Amended Complaint.



Dated: Central Islip, New York
        August 4, 2025

Robert E. Grossman
United States Bankruptcy Judge